Hillsborough
No. 87-096
No. 88-441

ROBERT S. TREISMAN

v.

TOWN OF BEDFORD

AND

DEAN KAMEN

August 9, 1989

*Wiggin & Nourie*, of Manchester (*William S. Orcutt* and *Doreen F. Connor* on the brief, and *Mr. Orcutt* orally), for the plaintiff.

*Upton, Sanders & Smith*, of Concord (*Barton Mayer* on the brief and orally), for the defendant Town of Bedford.

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Bartram C. Branch* and *Thomas Quarles, Jr.*, on the brief, and *Mr. Branch* orally), for the defendant Dean Kamen.

JOHNSON, J. This consolidated appeal presents various challenges to superior court rulings in two zoning actions. Both actions arise from plaintiff Robert Treisman's objections to defendant Dean Kamen's construction of a heliport and use and storage of a helicopter at his property in Bedford. In case No. 87-096, defendants Kamen and the Town of Bedford appeal from a decision of the Superior Court (*McHugh*, J.) reversing the Bedford Zoning Board of Adjustment's decision to grant Kamen a variance allowing the disputed uses. In case No. 88-441, the defendants appeal from a decision of the Superior Court (*Goode*, J.) invalidating a zoning amendment that permitted helicopter use in Bedford's residential and agricultural zones subject to certain conditions. Plaintiff Treisman has also filed a cross-appeal in this second case, challenging two of the court's rulings against him. For reasons that follow, we reverse the decision in No. 88-441, and therefore need not rule on defendants' appeal in No. 87-096.

The following facts are not in dispute. Treisman and Kamen own and reside on abutting properties in Bedford. During 1981 and 1982, after gaining the approval of various regulatory authorities and abutting landowners, Kamen built a heliport on his property and began to use a helicopter to commute to work. In 1982, Treisman, the only abutter who had not indicated his assent to these uses, filed suit to enjoin them. In Treisman's ultimate appeal to this court, we held that the uses in question were permissible under the Bedford ordinance only if they came within the common law definition of accessory use and remanded to the trial court for that determination. *Treisman v. Kamen*, 126 N.H. 372, 375–78, 493 A.2d 466, 469–72 (1985). We later summarily affirmed the trial court's decision that Kamen's heliport was not an accessory use under the common law definition and that it was therefore prohibited by the Bedford ordinance. (Order issued June 4, 1987 in case No. 86-500.)

In August 1985, Kamen applied to the Bedford Zoning Board of Adjustment for a variance to permit the use in question, and the board granted the variance the following month. After the board denied Treisman's motion for reconsideration, he appealed its decision to the superior court, which ultimately held that the variance had been improperly granted because there was no evidence that its denial would result in unnecessary hardship.

Before the superior court's final decision on the variance, Kamen petitioned the town to amend its zoning ordinance to permit the storage and use of helicopters in its residential and agricultural districts as an accessory use. The proposed ordinance provided:

> "Accessory Uses—Residents in the Residential and Agricultural Districts shall be allowed to house and operate a helicopter at a residence located in the Residential and Agricultural District if all the following criteria have been met by the resident:
>
> (1) The resident's lot upon which the helicopter is housed shall consist of at least five (5) acres.
>
> (2) Prior to the housing of a helicopter at a residence pursuant to this Section C, the New Hampshire Aeronautics Commission and the Federal Aviation Administration shall have approved of the resident's lot for a private non-commercial helipad. The New Hampshire Aeronautics Commission and the Federal Aviation Administration shall have determined that the site and flight path are in compliance with all applicable governmental regulations and that no safety hazards exist as long as established flight patterns are followed.

(3) The helicopter shall be used for non-commercial purposes only.

(4) The helicopter shall be made available to assist Bedford law enforcement personnel and the Bedford Fire Department when prudent and necessary.

(5) The helicopter shall be flown such that it will be at a normal operating altitude before flying directly over any residence.

(6) The area where the helicopter is housed shall be appropriately screened such that the helicopter is not readily visible by the abutters."

The Bedford Planning Board indicated that it approved of the helicopter amendment, and voters passed it at the town meeting on March 10, 1987, by a vote of 1327 to 929. Before that date, Treisman filed a timely protest petition pursuant to RSA 675:5, I(b), seeking to require passage by a two-thirds majority. The Bedford Selectmen denied this petition on grounds that it did not comply with statutory requirements. Following the selectmen's further denial of Treisman's motion for a rehearing, he appealed to the superior court, which held the amendment invalid for a number of reasons.

The court specifically held that the amendment was invalid because: (1) the town had no power to create an accessory use where that use was not within the common law definition; (2) the amendment effected spot zoning; (3) the Bedford Planning Board had not sufficiently complied with statutory requirements for adoption of a master plan and could therefore adopt neither a valid zoning ordinance nor a valid zoning amendment; (4) a circular the planning board distributed to voters before the 1987 town meeting described the effect of the proposed amendment in a misleading way; and (5) the requirement that owners make helicopters available to assist Bedford's law enforcement and fire officials was arbitrary and unreasonable. The court ruled against Treisman on, among others, two further questions now at issue on cross-appeal; it agreed with the planning board that the protest petition did not meet statutory requirements and that the amendment did not violate the airport zoning provisions of RSA chapter 424. On appeal, each party challenges those rulings contrary to its position. We address each ruling in turn below.

## I. *Power to Create Accessory Use*

■ The superior court erred as a matter of law in holding that Bedford voters could not amend the town's zoning ordinance to allow the storage and operation of helicopters as an accessory use in the residential and agricultural zones. Because a zoning ordinance cannot specifically provide for every lawful use, the rule of accessory use recognizes that owners may employ land in some ways the ordinance does not expressly permit. *Town of Salem v. Durrett*, 125 N.H. 29, 32, 480 A.2d 9, 10 (1984). A zoning ordinance itself sometimes defines "accessory use," but where the ordinance is silent courts apply the common law definition. *Id.* at 32, 480 A.2d at 10–11.

■ As the superior court correctly stated, all accessory uses, whether defined by ordinance or by common law, must share one characteristic: each must be a subordinate rather than a principal use of the property. *Town of Salem v. Durrett*, 125 N.H. at 32, 480 A.2d at 11. In this case, however, the superior court further held that any accessory use must be "customarily incident to the principle (sic) use, and so necessary or commonly to be expected in conjunction therewith that it cannot be supposed the ordinance was intended to prevent it."

The requirement of subordinate use goes to the very essence of a use that is "accessory," and any use so categorized must fulfill it. But the requirement of customary incidence simply provides a method by which the common law, in the absence of explicit provision or definition, can identify which of all possible subordinate uses are consistent with the ordinance. As one commentator notes:

> "In situations where there is no . . . specific provision in the ordinance, the question is the extent to which the principal use, as a matter of custom, carries with it an incidental use so that as a matter of law, in the absence of a complete prohibition of the claimed incidental use in the ordinance, it will be deemed that the legislative intent was to include it."

2 A. RATHKOPF, THE LAW OF ZONING AND PLANNING § 23.01[3], at 23–7 (4th ed. 1989).

■ Here, the helicopter amendment specifically requires that any helicopter kept in the residential and agricultural districts "be used for non-commercial purposes" and only permits "[r]esidents in the Residential and Agricultural Districts . . . to house and operate

a helicopter at a residence. . . ." These provisions insure that the storage and operation of helicopters is subordinate to primary residential use, and the amendment therefore satisfies the only requirement that it must in order to properly define helicopter uses as accessory.

## II. *Spot Zoning*

The trial court also erred in characterizing the helicopter amendment as an instance of spot zoning. Spot zoning occurs when an area:

> "is singled out for treatment different from that of similar surrounding land which cannot be justified on the bases of health, safety, morals or general welfare of the community and which is not in accordance with a comprehensive plan."

*Schadlick v. Concord*, 108 N.H. 319, 322, 234 A.2d 523, 526 (1967). Bedford's amendment does not unjustifiably single out a particular area for special treatment; it allows for the storage and operation of helicopters anywhere within the residential and agricultural zones, so long as specified conditions are satisfied.

Contrary to the trial court's findings, the fact that planning board members were uncertain of the number and locations of five-acre parcels in the districts and that purchasers of several smaller lots might form new five-acre parcels does not mean that the amendment was arbitrary and capricious or out of keeping with a comprehensive zoning plan. Before the 1987 town meeting, the planning board obtained information relevant to its decision by holding a hearing where safety concerns and individual interests in using helicopters for personal transportation were discussed. Moreover, far from making an arbitrary determination as to the conditions to be fulfilled in order to comply with the ordinance, the amendment, as adopted, requires a sizeable lot, approval of State and federal agencies, residential non-commercial use, and appropriate screening to protect abutters. All of these measures insure that storage and operation is safe and relatively unintrusive wherever it occurs in the residential and agricultural zones. Finally, there is no indication that, so limited, this amendment is otherwise inconsistent with a comprehensive plan for zoning in Bedford. 1 A. RATHKOPF, *supra* § 12.01, at 12–2 (requirement for comprehensive plan, as opposed to master plan, typically means "that the zoning ordinance should be free of gross irrationalities, inconsistencies, and discrepancies").

III. *Adoption of Master Plan*

■ The superior court found that no document was identified at trial as Bedford's master plan, and that the document defendants' counsel alleged to be the master plan did not meet statutory requirements. These findings were contrary to the clear weight of the evidence.

RSA 674:1, I, requires every planning board established by a local legislative body "to prepare and amend from time to time a master plan to guide the development of the municipality." A master plan consists of:

> "a report or set of statements and land use and development proposals with accompanying maps, diagrams, charts and descriptive matter designed to show as fully as is possible and practical the planning board's recommendations for the desirable development of the territory legally and logically within its planning jurisdiction."

RSA 674:2 (Supp. 1988). Depending on the municipality's requirements, the master plan may include various specific sections also described in RSA 674:2. However, before the local legislative body may adopt a zoning ordinance, the statute requires the planning board to adopt a general statement of objectives and the land use section of the master plan, as described in RSA 674:2, I and II. RSA 674:18. Furthermore, a master plan cannot "be legal or have any force and effect until copies of it are certified by a majority of the board or commission and filed with the city or town clerk." RSA 675:6, III.

Bedford did have a master plan that complied with statutory requirements. Contrary to the superior court's findings, Martha Harris, Bedford Planning Board secretary since 1977, specifically identified an exhibit entitled "Bedford, N.H. Planning Studies 1979/80" as the document commonly understood to be Bedford's master plan. She explained that this document, which consists of reports and accompanying maps on topics including landscape, utilities, population, traffic, community facilities, schools, and economic base and development, was produced for Bedford by John Atwood, a Boston planner. Minutes from planning board meetings in 1979 and 1980 further indicate that Atwood provided the board with proposals on the above topics during these years and that, at a working session on January 9, 1980, the planning board voted to accept a master plan Atwood had prepared. Harris did admit that the board was no longer in possession of the working maps and

original reports voted on in 1980. But she further testified that the final version of the 1979/80 planning studies, which was presented at trial and which Atwood ultimately provided to the board on March 27, 1981, contained all the information on the basis of which the board voted. She also identified reports and maps, substantially the same as those contained in the alleged master plan, as working documents provided by Atwood in 1979 and 1980 in anticipation of hearings and a vote on the plan. She further identified, as a summary of Bedford's master plan, a colored map entitled "The Bedford Plan 1980" and bearing the names of the members of the 1980 planning board.

Although Harris was not always certain of precisely what documents were referred to at certain places in the relevant minutes or where those documents might now be found, she clearly testified to the existence of a master plan, and neither her further statements nor the testimony of other witnesses or any other evidence presented contradicted this testimony. Although he was not a member in 1980, 1987 Bedford Planning Board member Charles Colpitts also identified the document entitled "Planning Studies 1979/80" as the document commonly understood to be Bedford's master plan. The evidence presented therefore supported no other conclusion than that these documents were the master plan adopted by the Bedford Planning Board on January 9, 1980. That the documents presented at trial are not precisely those voted on makes no difference. It is clear that the board voted on a set of maps and reports in 1980 and that, after adoption, the planner merely put these in final form for public consumption.

In addition, this master plan contains a general statement and a land use section that satisfy statutory requirements. According to RSA 674:2, I, the general statement "shall include such topics as the objectives, principles, assumptions, policies and standards upon which the constituent proposals for the physical and socioeconomic development of the municipality are based." A master plan must also include a land use section "which takes into account natural conditions and which shows the existing conditions and the proposed location, extent, and intensity of future land usage." RSA 674:2, II.

The Bedford master plan includes an introduction stating the objectives and assumptions on which the studies that compose the plan are based. In particular, this general statement considers Bedford's present situation and future possibilities in light of the great increase in town population between 1960 and 1980 and the likelihood of continued growth. The statement briefly mentions the

need for utility systems, public facilities, and zoning and subdivision regulations. It then describes the small amount of developable land still available in Bedford and the importance of shaping development to insure Bedford's future as a cohesive town rather than a series of subdivisions. This introduction satisfies the statutory requirements for a general statement.

■ The plan's first chapter, entitled "The Bedford Landscape," similarly satisfies the statutory requirement for a land use section. It describes the various areas in Bedford and their present uses, natural conditions, and possibilities for future development. Accompanying maps identify the location of developed and undeveloped areas, and descriptions of natural conditions indicate which areas are reasonably open to future development. The plan's remaining chapters and the colored map indicate the need for and proposed location of roads, trails and utility systems. Because a master plan is merely a general guide to aid planning boards in making zoning decisions, *see Rancourt v. Town of Barnstead*, 129 N.H. 45, 48–49, 523 A.2d 55, 58 (1986) (master plan indicates board's recommendations for desirable development and, unlike an ordinance, cannot be directly applied), it need not, and indeed cannot, be particularly detailed in describing future land uses. We hold that the Bedford plan provides all that is necessary in this regard.

Although the Bedford Planning Board adopted an adequate master plan on January 9, 1980, the parties agree that this plan was not certified by the board before filing with the Bedford town clerk. *See* RSA 675:6, III. The map identified as a summary of the plan does bear the names of the members of the Bedford Planning Board at the time the plan was adopted. Neither the map nor the plan presented at trial, however, actually bears the signatures of planning board members, and the defendants conceded at trial that copies on file with the town clerk and the assessor likewise lack signatures.

■ The Bedford master plan therefore fails to meet all requirements necessary to give it legal effect under the statute. New Hampshire, however, recognizes the doctrine of substantial compliance. *See, e.g., McKinney v. Riley*, 105 N.H. 249, 252, 197 A.2d 218, 221 (1964). We have consistently refused to require strict adherence to statutory requirements in the land-use context where "to do so would frustrate the legislative purpose and deny landowners the protection afforded them by statute." *Bourgeois v. Town of Bedford*, 120 N.H. 145, 148, 412 A.2d 1021, 1024 (1980).

Here Bedford clearly had an adequate master plan on file. Particularly in the absence of any allegation that Treisman was unable to obtain a copy of the plan or was in any way prejudiced by the planning board's failure to comply strictly with statutory requirements, we will not invalidate this otherwise proper amendment to the zoning ordinance or place in question the validity of the ordinance itself. *See id.* at 148–49, 412 A.2d at 1023–24 (minor deviation from statutory requirements not fatal where essential purpose of statute fulfilled).

IV. *Effect of Planning Board Circular*

Before the adoption of the helicopter amendment at the March 10, 1987 town meeting, the planning board mailed voters a circular describing each proposed amendment to the zoning ordinance and stating the board's recommendation. The circular cautioned voters that it only contained proposed changes and board recommendations, which voters could either accept or reject at the town meeting. The circular printed each proposed amendment in full, followed by the planning board's recommendation and a brief explanation. With respect to the helicopter amendment, the circular read:

> "THE PLANNING BOARD IS IN FAVOR OF THIS
> ARTICLE
>
> *"What is this all about?*
>
> "The petitioners are concerned that there is currently no Ordinance governing the storage and use of helicopters in the Town of Bedford. They feel that this is a major safety and zoning issue that should be addressed.
>
> *"Why is the Planning Board in favor of this Article?* The Planning Board is in favor of this Article because:
>
> > It agrees with the petitioners that there should be zoning restricting and regulating the use of helicopters in the Town. Currently there are supposedly four (4) helicopters operating from helipads in the Town.
> >
> > The Board of Selectmen endorse this Ordinance as long overdue.
> >
> > During the Public Hearing many people spoke in favor of this petition and hardly anyone spoke against it."

Neither party contests the planning board's authority to issue a circular of this type. However, Kamen challenges the superior court's determination that, because the circular could have misled

voters, the vote on the amendment was invalid. There is no question that the circular could have misled voters. Although the Bedford Zoning Ordinance did not permit residential and agricultural zone residents to store or operate helicopters on their property prior to the amendment in question, the circular gives the impression that helicopters were being used legally under the existing ordinance and that amendment was necessary in order to regulate this use.

The superior court incorrectly held, however, that the amendment was consequently invalid. Treisman, who brought no challenge until after the fact, bore the burden of establishing that, in all likelihood, the misleading nature of the circular affected the outcome of the vote. *Keene v. Gerry's Cash Mkt., Inc.*, 113 N.H. 165, 167, 304 A.2d 873, 875 (1973); *cf. Concrete Co. v. Rheaume Builders*, 101 N.H. 59, 61, 132 A.2d 133, 136 (1957) (refusing to construe a proposal to amend the State Constitution in a way contrary to the clear import of its language despite evidence that, given the surrounding circumstances, the voters may have intended a different meaning). Although Treisman presented evidence that voters tended to vote in accordance with the board's recommendations on each of the proposed amendments, he presented no evidence that the vote on the helicopter amendment was the result of confusion as to the status of helicopter use under the unamended zoning ordinance.

Kamen and the town, on the other hand, presented substantial evidence that the voters were not misled. They demonstrated that many sources other than the planning board circular provided public information on the helicopter amendment. Local newspapers printed three articles concerning the proposed amendment prior to the vote, each of which said the amendment would "allow" the use of helicopters in Bedford. In addition, Treisman and Kamen each mailed thousands of letters to the Bedford voters before the town meeting. Treisman's letter, addressed to the "Bedford Voter," stated, "at the March 10, 1987 Bedford Town Meeting, you will be asked to vote on a zoning amendment which, if passed, would *allow* the use of helicopters. . . ." (Emphasis added.) The letter described the dangers and noise associated with helicopter use and urged Bedford residents to vote against the amendment. Kamen's letter stated that the Bedford voters would "be asked to decide whether I, or anyone else, should have the *right to house a helicopter* in Bedford." (Emphasis added.) Kamen and the town also presented evidence that, at a rehearing before the selectmen pursuant to RSA chapter 677, where citizens who had voted both for and against the

amendment spoke, not one person stated that he or she had been misled by the planning board circular.

 Treisman, in short, did not carry his burden of proof, and, in the absence of evidence that irregularities affected the vote, the amendment here was valid and must be accorded its clear meaning. *Pollard v. Gregg*, 77 N.H. 190, 194, 90 A. 176, 178 (1914). However, we do not imply that misleading information disseminated by a governmental entity could not under other circumstances be in and of itself a ground for invalidating the amendment.

V. *Requirement of Availability for Municipal Use*

 Finally, the fact that it contained one invalid provision is insufficient to invalidate the helicopter amendment as a whole. The superior court correctly determined that Bedford could not require helicopter owners to make their helicopters available for the use of the town's police and fire departments. Municipalities may exercise zoning authority "only in accordance with applicable statutes." *PMC Realty Trust v. Town of Derry*, 125 N.H. 126, 130, 480 A.2d 51, 53 (1984). Our zoning statutes empower municipalities to regulate the use of land, *see* RSA 674:16, :17, but not to regulate individual activities unrelated to land. *Vlahos Realty Co. v. Little Boar's Head District*, 101 N.H. 460, 463, 146 A.2d 257, 260 (1958). Absent reason to believe that the legislative body would not have passed the ordinance without it, however, one invalid section will not invalidate an entire piece of legislation. *See, e.g., Fernald v. Bassett*, 107 N.H. 282, 285, 220 A.2d 739, 742 (1966). There is no reason to believe that Bedford voters would not have passed the amendment without the section in question. The most common concerns voiced prior to the vote bore on the safety and comfort of potential neighbors, not enhancement of town services, and the amendment addresses these more prevalent concerns. Moreover, absence of a requirement that private helicopters be made available to police and fire officials does not mean that, when help is needed, owners would be unwilling to provide it.

 As noted above, Treisman challenges the superior court's rulings against him on two issues. We agree with the superior court on each. First, it is clear that the provisions of RSA chapter 424 do not invalidate Bedford's helicopter amendment. Although RSA 424:5 (Supp. 1988) requires towns to adopt airport zoning regulations if they have airports within their limits, the chapter provides no penalty for failure to do so. Moreover, provision for the department of transportation to adopt regulations in the absence

of municipal action is purely permissive. RSA 424:5, V (Supp. 1988). Although the department of transportation is separately required to adopt regulations under some circumstances, these provisions apply only to publicly owned airports, RSA 424:3 (Supp. 1988), and airports licensed for commercial operation, RSA 424:4 (Supp. 1988). The helicopter amendment applies only to private, non-commercial heliports.

Second, the superior court determined that Treisman's protest petition failed to satisfy the requirements of RSA 675:5, I(b) and therefore did not require a two-thirds vote for passage of the helicopter amendment. RSA 675:5, I(b) provides that a zoning amendment must be approved by a two-thirds vote when the planning board receives a petition containing signatures of:

> "[t]he owners of 20 percent of the area within 100 feet immediately adjacent thereto or across a street therefrom. . . ."

Whatever other deficiencies there may have been in the petition, no one suggests that it contained signatures of the owners of 20 percent of the land adjacent to or across the street from the area to be rezoned. At most, it contained the signatures of the owners of 20 percent of the land adjacent to or across the street from the Kamen property. As we have already noted, the amendment does not rezone a discrete parcel, but applies to the residential and agricultural districts in their entireties. The fact that Kamen will almost surely take advantage of the amendment does not alter statutory requirements, and the protest petition was clearly insufficient to require a two-thirds vote.

We therefore hold that the Bedford helicopter amendment was validly enacted. As a result, we need not rule on the validity of the variance granted to Kamen.

*No. 88-441, reversed in part and affirmed in part; No. 87-096, dismissed.*

All concurred.